*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

# MEMORANDUM OPINION

No. 04-08-00500-CR

Maurean C. **PATTERSON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No.1, Bexar County, Texas
Trial Court No. 969943
Honorable Al Alonso, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
            Sandee Bryan Marion, Justice
            Phylis J. Speedlin, Justice

Delivered and Filed:   May 13, 2009

AFFIRMED

Maureen Patterson was charged by information with resisting arrest. The information specifically alleged that Patterson intentionally prevented and obstructed the complainant, Officer Robert Ingram, from effecting an arrest of Patterson by striking Officer Ingram with Patterson's hand. After a jury trial, Patterson was found guilty of resisting arrest. On appeal, she claims the evidence was factually insufficient to sustain her conviction because the great weight and

preponderance of the evidence shows that she did not strike Officer Ingram. We hold the evidence factually sufficient and affirm the trial court's judgment.

## DISCUSSION

### 1. *Standard of Review*

In a factual sufficiency review, we review all the evidence in a neutral light and will set aside the verdict only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

### 2. *Resisting Arrest*

A person commits the offense of resisting arrest if "he intentionally prevents or obstructs a person he knows is a peace officer . . . from effecting an arrest . . . of the actor or another by using force against the peace officer or another." TEX. PENAL CODE ANN. § 38.03(a) (Vernon 2003). The information in this case charged Patterson with resisting arrest by using force, specifically by "striking the complainant with the hand of the defendant."

### 3. *The Testimony*

San Antonio Police Officer Robert Ingram testified at trial that, on the day of the incident involving Patterson, he responded to a call for officer assistance at the Villa de Valencia Apartments. Two other officers, Officers Fletcher and Blanquiz, had requested assistance of additional officers because a large group of people had gathered over some type of altercation. When Officer Ingram arrived at the apartment complex, he observed two opposing groups of people in the middle of the parking lot. He immediately focused on Patterson because she was cursing very loudly. Officer Ingram told Patterson to stop and to go inside. When she refused, Officer Ingram told Patterson she could either stop and go inside, or she could go to jail. When Patterson persisted, Officer Ingram

placed her under arrest. As he reached out to handcuff her, Patterson grabbed a metal railing and continued to yell and curse at Officer Ingram. As Officer Ingram struggled to take Patterson into custody, Patterson's right arm was flailing back and hitting him in the side. According to Officer Ingram, Patterson was swinging her arm back, trying to hit him wherever she could. Officer Ingram particularly remembers Patterson striking him on his right side because he carries his weapon on that side. Officer Ingram testified that the strikes to his body caused him pain. He eventually forced Patterson to the ground, and one of the other officers helped him handcuff her. As Officer Ingram and the other officer were putting Patterson into the car, she continued kicking Officer Ingram in the knees and shins.

Officer Mike Blanquiz also testified at trial about the incident involving Patterson at the Villa de Valencia apartments. Officer Blanquiz was one of the police officers who responded to a call at the apartments because there was a fight in progress. When he arrived, he saw two groups of people in the parking lot arguing with each other. People were cursing at each other, and the officers attempted to get the people to go back inside their apartments. According to Officer Blanquiz, the main people who were fighting were Patterson and another women named Joilynn Rhodes. As Officer Blanquiz went to detain Rhodes, Officer Ingram went to detain Patterson. As Officer Blanquiz handcuffed Rhodes and placed her in the back of the police car, he noticed a scuffle between Patterson and Officer Ingram. Officer Blanquiz saw Patterson "stiff arm" Officer Ingram as he tried to guide her to the police car. Although Officer Blanquiz did not know whether Patterson pushed, jerked, or pulled her arm, he did see Patterson get away from Officer Ingram. According to Officer Blanquiz, because he was focusing on Rhodes, he did not see everything that was going on between Patterson and Officer Ingram. Officer Blanquiz, however, testified that he did see Patterson

kicking back at Officer Ingram as he tried to put her in the police car. Officer Blanquiz did not see Patterson hit Officer Ingram.

Several civilian witnesses testified at trial as well. Harold Johnson Jr. was a tenant at the Villa de Valencia at the time of the incident involving Patterson. According to Johnson, the police came to the apartments because of some fighting between some tenants. Johnson saw what happened by looking out his apartment window. He only saw "a little bit of what was happening" because he did not want to be involved. He saw that Patterson was handcuffed and that she was moving around a little bit. It looked to him like Patterson was trying to resist arrest. Johnson did not remember Patterson striking the officer with her hand. He did not, however, see the whole event between the officer and Patterson.

Another witness, Corina Berlanga, testified that she was at the Villa de Valencia on the day in question. According to Berlanga, the officer who arrested Patterson grabbed her, threw her down, lifted her off the ground, took her to the car, threw her down again, and arrested her. Berlanga did not see Patterson hit the officer.

Additionally, Michelle Davis testified that she witnessed the incident involving Patterson. According to Davis, she saw the police officer and Patterson struggling on the stairwell. The officer put his arm around Patterson's neck and picked her up off the ground. Davis did not see Patterson hit the officer with her hand.

Maria Hansell, also a tenant at the Villa de Valencia apartments at the time in question, testified that she witnessed Patterson's arrest. According to Hansell, the officer grabbed Patterson to handcuff her, and Patterson kept moving her hands around. The officer and Patterson ended up on the ground, but Hansell did not see how that happened. Hansell saw Patterson swinging her

hands, but she did not see Patterson hit the officer. Hansell then saw the officer handcuff Patterson and put her in the police car.

Patterson also testified at trial. According to Patterson, she was helping break up a fight at the Villa de Valencia apartments on the day in question. The police came and told everyone to go inside. She stood there talking to Rhodes and then decided to go home. As she was walking to her apartment, she realized that she had left her keys at Rhodes's apartment. So, she returned to get them. Patterson saw that there were more people, more police, and the situation had escalated. Patterson stood around because she wanted to see what was happening. Patterson tried to encourage Rhodes to go in the house and, in the process, used some curse words. Patterson was shouting because she felt the police officers were being racist. As Patterson was standing on the stairs yelling, an officer threatened to arrest her if she continued to talk. The officer then grabbed her, pushed her against the stair rail, and threw her on the ground. He then picked her up with his forearm by her neck. According to Patterson, she did not hit the officer with her hand or fist. Patterson testified that she did not have time to hit him, even if she had wanted to, because he was choking her.

3.    *Analysis*

Patterson contends the evidence is factually insufficient to sustain the verdict because Officer Ingram was the only witness to testify that Patterson struck him with her hand while he was lawfully arresting her. Patterson emphasizes that none of the other witnesses who testified saw Patterson strike Officer Ingram. Thus, according to Patterson, the great weight and preponderance of the evidence shows she did not strike Officer Ingram and the evidence is "so weak" that the verdict seems "clearly wrong and manifestly unjust." *See Lancon*, 253 S.W.3d at 705.

We agree with Patterson that, of all the witnesses who testified, Officer Ingram was the only witness to specifically testify that Patterson struck him with her hand. However, other witnesses did testify about what happened between Officer Ingram and Patterson. Officer Blanquiz testified that Patterson and Officer Ingram engaged in a scuffle, that Patterson did get away from Officer Ingram, and that because he was focusing on Rhodes, he did not see everything that was going on between Patterson and Officer Ingram. Likewise, Harold Johnson Jr. testified that although it appeared to him that Patterson was resisting arrest, he did not witness the whole event between Patterson and Officer Ingram. And, Corina Berlanga and Michelle Davis testified that, although there was a struggle, they did not actually see Patterson hit Officer Ingram. Maria Hansell saw Patterson swinging her arms around, but also did not actually see Patterson hit Officer Ingram. Patterson, of course, testified that she did not hit Officer Ingram. However, other than Patterson, none of the witnesses testified that Patterson did *not* hit Officer Ingram – only that they did not *see* Patterson hit Officer Ingram. And, other than Patterson, none of the other witnesses claimed to have witnessed everything that occurred between Patterson and Officer Ingram.

In analyzing a factual sufficiency of the evidence challenge, we recognize that, although contradictory witness testimony may be compelling, the jury is the sole judge of the weight and credibility given to the witness's testimony. *Id.* As an appellate court, we "must give deference to a jury's decision regarding what weight to give contradictory testimonial evidence because the decision is most likely based on an evaluation of credibility and demeanor, which the jury is in the better position to judge." *Id.* at 706. Thus, applying the proper standard, we conclude the evidence is factually sufficient to support the jury's verdict.

We affirm the trial court's judgment.

Karen Angelini, Justice

Do not publish